IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BACKCOUNTRY HORSEMEN OF MISSOULA, FRIENDS OF THE BITTERROOT, and SELWAY-PINTLER WILDERNESS BACKCOUNTRY HORSEMEN,<br><br>         Plaintiffs,<br><br>   vs.<br><br>LEANNE MARTEN, in her official capacity as Regional Forester, Northern Region; RANDY MOORE, in his official capacity as the Chief of the U.S. Forest Service; LISA TIMCHAK Forest Supervisor, Beaverhead-Deerlodge National Forest, U.S. FOREST SERVICE, Northern Region and BEAVERHEAD-DEERLODGE NATIONAL FOREST,<br><br>        Defendants. | CV 24–37–M–KLD<br><br><br>ORDER |

Plaintiffs Backcountry Horsemen of Missoula, Friends of the Bitterroot, and Selway-Pintler Wilderness Backcountry Horsemen bring this action challenging the United States Forest Service's decision approving the Five Communication Repeaters Installation Project ("Repeater Project") on the Beaverhead-Deerlodge National Forest ("BDNF") and alleging violations of the National Environmental

1

Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and the National Forest

Management Act ("NFMA"), 16 U.S.C. §1601 et seq. (Doc. 1). The above-named

Defendants (collectively "Forest Service") have filed a Motion for Voluntary

Remand Without Vacatur (Doc. 21), which is granted for the reasons outlined

below.

I.    **Background**

The 2009 Forest Plan for the BDNF outlines goal and standards for

Forestwide Direction, including wireless telecommunication facilities. *See e.g.*

AR000032-000033, AR00069. In 2017, the Forest Service proposed the Repeater

Project to improve the BDNF's communication capabilities by installing four radio

repeaters in areas identified with poor or nonexistent radio communication,

including one repeater on Odell Mountain within the West Pioneer Wilderness

Study Area.[1] (Doc. 1-4, AR 005191-94). The Forest Service determined that

additional radio repeater sites were needed to provide adequate and consistent

communication due to mountains blocking radio access in some locations and

explained that the purpose of the proposed project was to improve communications

for employees and emergency personnel by installing additional repeater sites to

---

[1] The Repeater Project also encompassed a fifth repeater, which was installed on
Henderson Mount in the summer of 2013. (Doc. 1 at ¶ 105; Doc. 1-4 at 2).

improve radio communications and increase employee and public safety. (Doc. 1-4 at 1, AR 005191).

The Forest Service classified the Repeater Project as a categorical exclusion, which excludes a proposed action from further NEPA analysis and documentation in an Environmental Impact Statement ("EIS") or Environmental Assessment ("EA") if there are no extraordinary circumstances and the proposed action falls within one of several listed categories. (Doc. 1-4 at 1, AR 005191). *See* 36 C.F.R. § 220.6 (2008) ("A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action" and the proposed action falls within a listed category). Before relying on a categorical exclusion, the Forest Service is required to conduct scoping to determine whether a proposed action may have a significant effect on the environment. *See* 36 C.F.R. § 220.4(e)(1) (2008) ("Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS."); 36 C.F.R. § 220.6(c) (2008) ("If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," the Forest Service must prepare an EA).

The Forest Service completed a biological assessment in February 2020 (AR 005276-85) and approved the Repeater Project by a decision dated April 2, 2020. (Doc. 1-5, AR 005190). The Forest Service determined that the Repeater Project fell within the categorical exclusion for the "[r]epair and maintenance of administrative sites" specified in 36 C.F.R. § 220.6(d)(3) and was therefore excluded from further documentation in an EA or EIS. (Doc. 1-5, AR 005190). The Forest Service installed the repeaters, including the repeater on Odell Mountain, during the summer of 2020. (Doc. 1 at ¶ 110; Doc. 1-11 at ¶ 22).

Plaintiffs filed this action in March 2024, asserting four claims for relief. (Doc. 1). Count 1 alleges the Forest Service failed to adequately scope the Repeater Project in violation of NEPA. Specifically, Plaintiffs claim that the Forest Service did not provide notice of the Repeater Project to the public until after the repeaters had been installed and did not afford the public the opportunity to comment, in violation of its public notification and scoping regulations. (Doc. 1 ¶¶ at 132-38).

Count 2 alleges the Forest Service improperly applied the categorical exclusion for the "[r]epair and maintenance of administrative sites" found at 36 C.F.R. § 220.6(d)(3) to the Repeater Project in violation of NEPA and Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). Specifically, Plaintiffs assert that § 220.6(d)(3) applies only to existing administrative sites, and

4

because the repeater stations at issue were installed on locations that have never been considered existing administrative sites, the Forest Service wrongfully relied on § 220.6(d)(3) to classify the Repeater Project as a categorical exception. (Doc. 1 at ¶¶ 140-45).

Count 3 alleges there were extraordinary circumstances precluding the use of a categorical exclusion, and the Forest Service violated NEPA by failing to complete an EA or EIS. Specifically, Plaintiffs claim that the installation of a repeater station on Odell Mountain in the West Pioneer WSA may cause serious harm to local resource conditions such that extraordinary circumstances exist and reliance on a categorical exclusion was improper.  (Doc. 1 at 146-56).

Count 4 alleges the Forest Service violated NFMA because the Repeater Project does not comply with the Forest Plan. Specifically, Plaintiffs assert that the installation of repeater stations fails to protect the West Pioneer WSA's high scenic integrity and wilderness character, and does not adhere to the Forest Plan's requirement that all wireless telecommunication facilities be located in designated communication sites and utility corridors. (Doc. 1 at ¶¶ 157-66).

Plaintiffs request declaratory and injunctive relief. They ask the Court to declare unlawful, vacate, and set aside the Forest Service's decision approving the Repeater Project, and request injunctive relief requiring the Forest Service to

remove the repeater on Odell Mountain pending compliance with NEPA, NFMA, and the APA. (Doc. 1 at 48).

Consistent with the deadlines in the Case Management Order (Doc. 19), the Forest Service filed the pending Motion for Voluntary Remand Without Vacatur in January 2025. (Doc. 21). The Forest Service agrees with Plaintiffs that this matter should be remanded to the agency for further consideration but asks the Court to order remand without vacatur—that is, leaving the Forest Service's decision approving the Repeater Project in place pending further agency proceedings.

## II.    <u>Discussion</u>

It is well-settled that "[a] federal agency may request remand in order to reconsider its initial action." *California Communities Against Toxics v. United States E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012). When an agency requests a remand to reconsider its previous position, it may do so "without confessing error." *Alliance for Wild Rockies v. Marten*, 2018 WL 2943251, at *2 (D. Mont June 12, 2018) (citing *SFK USA Inc. v. U.S.*, 254 F.3d 1022, 1027-28 (Fed. Cir. 2001).

"Generally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *California Communities*, 688 F.3d at 992. There is no indication here that the Forest Service's request to remand is frivolous or made in bad faith, and Plaintiffs do not oppose remand. Plaintiffs do, however, argue that the Court should vacate the decision approving the

Repeater Project and require removal of the repeater station on Odell Mountain pending further agency proceedings.

The current dispute thus centers on whether remand should be made with or without vacatur. Whether to remand with vacatur is "controlled by principles of equity." *Alliance for Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105, 1121 (9th Cir. 2018) (citation omitted). Vacatur is the presumptive remedy where an agency has acted unlawfully. *Alliance for the Wild Rockies*, 907 F.3d at 1121. But when equity so requires, an underlying agency action may be "left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures." *Alliance for the Wild Rockies*, 907 F.3d at 1121. "While the Ninth Circuit does not mandate vacatur, courts in the Ninth Circuit decline vacatur only in rare circumstances." *Alliance for the Wild Rockies v. Marten*, 2018 WL 2943251, at *2 (D. Mont. June 12, 2018) (quotation marks omitted). Because vacatur is the presumptive remedy, the Forest Service "bears the burden of demonstrating vacatur is inappropriate." *Northwest Environmental Advocates v. EPA*, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018).

When determining whether to leave an agency action in place on remand, the court weighs the seriousness of the agency's errors against the disruptive consequences of vacatur. *Alliance for the Wild Rockies v. Savage*, 375 F.Supp.3d

1152, 1155-56 (citing *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 522 (9th Cir. 2015)).

### A.    Seriousness of the Errors

In analyzing the seriousness of the errors, the court considers "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator*, 806 F.3d at 532.

The Forest Service does not concede any specific error but seeks remand for the purpose of rescoping the Repeater Project decision, seeking and considering public comment, and reconsidering whether the categorical exclusion cited by the agency as the basis for its decision was appropriate. (Doc. 22 at 3). The Forest Service acknowledges that failure to comply with NEPA's procedural requirements can in some cases be a serious omission but argues the consequences of any such error here are minimal.

Although Plaintiffs challenge the installation of all five repeater stations, the Forest Service notes that they focus primarily on the repeater station installed on Odell Mountain within the Pioneer Wilderness WSA. The Forest Service asserts based on a declaration, photographs, and video provided by Recreation, Special Uses, Planning, and GIS officer Megan Mullowney (Doc. 22-8)*,* that the repeater

station has only a negligible effect on wide panoramic views from atop Odell Mountain due to its relatively small size and location. The Forest Service further asserts that the NEPA violations alleged by Plaintiffs are purely procedural, easily remedied on remand, and do not amount to serious error because the agency will likely take the same action following additional public comment and reconsideration of its decision. (Doc. 22-3; Doc. 22-9).

As evidence that the agency will likely make the same decision on remand, the Forest Service points to a declaration from the Radio System Designer for the BDNF, Sheryl Ritterbush, who explains that the agency placed the repeater equipment at the five chosen locations based on a detailed line-of-sight analysis designed to identify locations capable of providing the best possible radio coverage. (Doc. 22-9 at ¶¶ 2-5). Forest Service Electronics Technician for the BDNF, Robert Morris, similarly states in a supporting declaration that the five repeaters installed as part of the Repeater Project "were sited so [as] to provide reliable communications in areas with poor or nonexistent radio coverage." (Doc. 22-3 at ¶ 7). These declarations additionally reflect that the installation of the repeaters, particularly the repeater on Odell Mountain, has substantially improved radio communications on the BDNSF. (Doc. 22-3; Doc. 22-9). Because it is likely that the agency will make the same decision regarding the installation and

placement of the repeater stations even after allowing for public comment, the Forest Service submits, any errors are not serious enough to warrant vacatur.

Plaintiffs counter that there is an "alarming underlying trend" of the Forest Service disregarding the role of NEPA in its decision making "and an even greater disregard for the public's role in that work." (Doc. 27 at 21). Plaintiffs argue that public comment will likely influence whether the agency adopts the same decision on remand, as it has in the past. By way of example, Plaintiffs point to a 2015 Forest Service memo for a project that would have converted two temporary repeater sites, one of which was located on Deer Peak within the West Pioneer WSA, to permanent sites. (Doc. 1-3). Following public comment, the Forest Service converted only one of the sites to permanent status and left the temporary repeater on Deer Peak until a better site could be located and tested. (Doc. 1-3). Plaintiffs contend that "[i]f history is any guide," additional scoping in the form of public comment may in fact result in a different outcome for the Repeater Project, particularly the repeater on Odell Mountain. (Doc. 27 at 22). Plaintiffs claim that the Forest Service's alleged errors in this case are "indicative of a broader pattern of abusing categorical exclusions and the resulting deterioration of important wilderness areas." (Doc. 27 at 23). Plaintiffs maintain that while the installation of a repeater station on Odell Mountain may, in isolation, appear minimal, considered in the greater context it represents a more serious problem because "these

10

individual acts compound and result in the exact degradation that NEPA was designed to protect against." (Doc. 27 at 24).

To the extent Plaintiffs take the position that the agency action at issue here violates NEPA because it is part of a longstanding history of "abusing categorical exclusions" and "is part of a pattern of behavior indicative of a greater pathology," they do not provide authority to support such a theory of liability under NEPA. These arguments overlook the fact that the purpose of NEPA, which imposes only procedural requirements, is to "focus[] the agency's attention on the environmental consequences of *a proposed project*," and to avoid "uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989) (emphasis added). The Forest Service has agreed that on remand, it will address the NEPA violations alleged in the Complaint by rescoping the Repeater Project decision, seeking and considering public comment, and reconsidering whether the categorical exclusion cited by the agency as the basis for its decision was appropriate. (Doc. 22 at 3).

Because the main procedural errors alleged—the failure to adequately scope the project and provide for public comment—are easily remedied on remand, they are not so serious as to weigh in favor of vacatur. While Plaintiffs point to evidence that public comment may have affected a Forest Service decision on a different repeater project several years ago, the Forest Service has provided

11

declaration evidence that it will likely reach the same decision regarding the location of the repeaters at issue here, including the repeater on Odell Mountain, regardless of public comment. *See e.g. Center for Food Safety v. Regan*, 56 F.4th 648, 664 (9th Cir. 2022) (finding that vacatur for failure to comply with notice and comment requirements is not required "where an agency is likely to be able to offer better reasoning and adopt the same rule on remand").

The Court notes that because the Forest Service filed its motion to remand at the outset of these proceedings, the parties have not fully briefed the merits of whether the Forest Service erred in classifying the Repeater Project as a categorical exclusion. Because it is not clear whether the agency will likely reach the same decision on remand to rely on a categorical exclusion, this particular consideration does not weigh in favor of or against vacatur. For the reasons stated below, the Court finds that the disruptive consequences of vacatur outweigh the seriousness of this and the other alleged errors.

### B.    Disruptive Consequences of Vacatur

The seriousness of the agency's errors must be weighed against "the disruptive consequences of an interim change that may itself be changed." *California Communities*, 688 F.3d at 992 (citation omitted). Relevant considerations for purposes of assessing potential disruptive effects "include the economic impacts of vacatur, as well as the disruptive effects on the environment,

local communities, and wildlife." *Swan View Coalition v. Haaland*, 2024 WL

3219206, at *17 (D. Mont. June 28, 2024) (citing *Alliance for the Wild Rockies v*

Savage, 375 F.Supp.3d 1152, 1157 (D. Mont. 2019)). The court may also consider

other practical concerns and forms of harm to the public interest, such as negative

public safety consequences. *See e.g. California Communities*, 688 F.3d at 993

(remanding without vacatur in part because vacatur was likely to delay

construction of a much need power plant, risking blackouts and pollution from the

use of diesel generators); *Alliance for the Wild Rockies v. Marten*, 789 Fed. App'x

583, 584-85 (9th Cir. 2020) (unpublished) (remanding without vacatur because

vacatur "could have negative consequences for the environment and public

safety").

　　The Forest Service has come forward with declaration evidence that

vacating the Repeater Project, either in part as to the repeater on Odell Mountain or

in its entirety, would have a disruptive effect on the ability of the Forest Service

and its local partners to communicate across the BDNF. According to Forest

Supervisor Alfred Watson, many areas of the BDNF and surrounding communities

have weak or non-existent cell phone coverage, and "[r]adio communications are

critical for forest management and public safety." (Doc. 22-1 at ¶ 3). While the

Forest Service uses satellite communications in some instances, radio

communication is readily available, reliable, and is the preferred mode of

communication in emergencies. (Doc. 22-1 at ¶ 3). Watson explains that the Forest Service and the Beaverhead County Sheriff's Department—which provides law enforcement activities on Forest Service land pursuant to a working memorandum of understanding—both rely on the BDNF's radio communications network, including the repeaters at issue in this case, when responding to emergencies. (Doc. 22-1 at ¶ 6).

The Dillon Dispatch Interagency Center "is the main communication center for emergency response and wildland fire and serves as the radio dispatch center for just under 10 million acres of federal and state lands." (Doc. 22-2 at ¶ 2). According to center's acting manager, Claire Smith, Dillon Dispatch and other federal and state employees and partners use the repeaters installed as part of the Repeater Project on a daily basis "to communicate regarding prescribed burning operations, wildland fire control, law enforcement, and routine public land administration." (Doc. 22-2 at ¶¶ 4-5). The Odell Repeater in particular "is the primary communication link for the Big Hole area and provides coverage for most of the Wisdom Ranger District including arreas that were 'dead spots' prior to its installation." (Doc. 22-2 at ¶ 5).

Watson explains that removing the repeater stations at issue would greatly reduce radio communication capabilities on the BDNF, and would put employees, partners and volunteers at risk by eliminating "the only reliable form of

instantaneous communication for a large portion of the forest." (Doc. 22-1 at ¶ 9).
The Forest Service has provided declarations from a number of other Forest
Service employees describing the critical role that radio communication plays in
public and employee safety, and forest management. (Docs. 22-4; 22-5; 22-6; 22-
7). For instance, BDNF Fire Management Planning Specialist Richard Renau states
that "[r]epeaters are critical to the health and safety of [Forest Service] employees"
and the public, and describes multiple incidents during which he relied on the
agency's repeaters to relay important information and request medical assistance.
(Doc. 22-4 at ¶¶ 5-9). District Ranger Kristin Thompson, Patrol Captain Nicholas
Scholz, and Fire Management Officer Richard Griffin similarly describe the role
that radio communication plays in providing for public safety and carrying out law
enforcement and fire management activities on the BDNF. (Docs. 22-5; 22-6; 22-
7). Scholz states that removing repeaters on the BDNF would negatively impact
law enforcement activities (Doc. 22-6 at ¶ 5), and Griffin cautions that removing
the Odell Repeater would severely disrupt day-to-day fire operations and impair
safety on the BDNF. (Doc. 22-7 at ¶ 7).

　　　In response, Plaintiffs assert that the Forest Service's statements regarding
the disruptive effect of removing the repeaters are exaggerated and argue that
economic and environmental harm are the only relevant considerations for
purposes of assessing potential disruptive effects of vacatur. Plaintiffs argue these

considerations weigh in favor of vacatur because any economic harm due to the cost of removing the repeaters will be negligible, and removing the Odell Repeater is likely to have a positive effect on the environment by fulfilling the intended purpose of the West Pioneer WSA. Although Plaintiffs agree that communication networks are an important tool for the Forest Service, they contend the Forest Service could mitigate any disruption by implementing other communication tools, and further claim that the Odell Repeater provides only a small percentage of the total network coverage for the BDNF.

Plaintiffs' arguments are insufficient to overcome the evidence presented by the Forest Service. As pointed out above, the court may consider forms of harm to the public interest, such as negative public safety consequences, when assessing potential disruptive effects of vacatur. *See California Communities*, 688 F.3d at 993; *Alliance for the Wild Rockies,* 789 Fed. App'x at 584-85. The Forest Service has provided sufficient evidence demonstrating removing the repeaters, or even just the Odell Repeater, would have a significant disruptive effect on the communication system that the Forest Service relies on to ensure the safe and efficient administration of the BDNF. On balance, the Court finds that the Forest Service has met its burden of demonstrating the that the disruptive consequences of vacatur outweigh the seriousness of the agency's alleged errors. Accordingly, the Court concludes that remand without vacatur is appropriate.

If, as the Court has decided, remand without vacatur is appropriate, Plaintiffs ask the Court to impose a date certain—not to exceed two years from the date of the remand order—by which the Forest Service must complete its NEPA analysis. (Doc. 27 at 32-33). The Forest Service states that it intends to comply with NEPA, NFMA, and all other applicable laws on remand and will undertake future analysis in good faith, and so does not believe a date certain for NEPA completion is necessary. But if the Court orders a date certain for completion of that process, the Forest Service requests that date not be less than two years from the date of the Court's remand order. To ensure that the Forest Service acts promptly on remand, the Court will require that the agency complete the NEPA process on remand no later than two years from the date of this order.

## III.   Conclusion

Accordingly,

IT IS ORDERED that the Forest Service's Motion for Voluntary Remand Without Vacatur (Doc. 21) is GRANTED. The Forest Service shall have two years from the date of this Order to complete the NEPA process for the Repeater Project.

DATED this 19th day of August, 2025.

Kathleen L. DeSoto
United States Magistrate Judge